JOURNAL ENTRY AND OPINION
{¶ 1} Plaintiff Timra Ceccacci Valentyne appeals from the order of the domestic relations trial court which denied her motion to relocate. For the reasons set forth below, we reverse the order denying the motion to relocate and we remand this matter for further proceedings consistent with this opinion.
 {¶ 2} The parties were married on February 12, 1994, and had two children: Anthony (d.o.b. March 14, 1996) and Alex (d.o.b. April 20, 1999). The parties obtained a dissolution on October 2, 2000. In connection with the dissolution, Valentyne ("the mother") transferred her interest in the marital home to Joseph Ceccacci, Jr. ("the father") and entered into a shared parenting plan. Under the terms of this plan, the parties alternated residential possession of the children each week and agreed to obtain the consent of the other, or a court order, before removing the children from the jurisdiction. The father was also ordered to pay the mother $560.00 per month for child support and to provide health insurance for the children.
 {¶ 3} On August 28, 2002, the mother filed a Motion to Relocate Children in which she sought permission to relocate to Woodland Hills, California. In support of the motion, the mother provided an affidavit in which she averred that the parties had resided in California before their marriage, that the father's parents had also lived in California, that she is presently working as a waitress from 4:00 p.m. to 11:30 p.m., and earns $20,000 per year; that she has family members living in California who have made her a job offer working in the mortgage industry whereby she could earn two or three times her present salary; that the father has lost his job and the marital home is in foreclosure and "regular support ceased on August 5, 2002."
 {¶ 4} The matter was referred to the Family Conciliation Service. During pretrial proceedings, the genuineness of the mother's job prospect in California was apparently questioned. Thereafter, the mother filed a "Motion to Insure Parental Rights and Responsibilities" in which she indicated that:
 {¶ 5} "* * * I realize that, unless I can prove to the Court the reality of my potential new employment and the stability of the home situation in California, I cannot prevail in the current Motion pending before the Court. However, I am fearful that my plan to leave Cleveland for part of February, March, and April may be interpreted * * * as a permanent leave of my residence."
 {¶ 6} On November 5, 2002, the mother filed a motion to show cause in which she again averred that she had not received court ordered support for the past twelve weeks.
 {¶ 7} On January 24, 2003, the father filed a motion to reallocate parental rights and a brief in opposition to the motion to relocate. Within this motion, the father asked the court to reduce his child support obligation.
 {¶ 8} In an amended Motion to Show Cause, the mother additionally averred that the father was underemployed, that he had failed to provide health insurance for the children, and that the marital home was in foreclosure because the father had not made mortgage payments in over twelve months.
 {¶ 9} The mother's Motion to Relocate proceeded to an evidentiary hearing before a magistrate. In support of the motion, the mother presented the testimony of her sister, Kerstin Keene, and also testified on her own behalf.
 {¶ 10} Kerstin Keene testified that she lives in Saugus, California, and works for WMC Direct ("WMC"), a mortgage company. According to Keene, WMC has done over a billion dollars in business and is expanding. Keene earned approximately over $285,000 in 2002. She introduced the mother to Amy Brandt, a senior manager at WMC, and Brandt extended a job offer to her. The mother was hired as an internal support sales representative with a base salary of $3,000 per month with monthly incentives ranging from $1,000 to $3,000 per month. In addition, in the event that the WMC job falls through, Keene's father-in-law has also offered her a job at his construction company, which would pay $4,500 per month plus benefits.
 {¶ 11} Keene further testified that she emotionally and financially supports her sister's endeavor to relocate, and is very close to her and the boys. Keene determined that they could rent a home for $1,200 per month and that the boys could attend the Saugus school system which, she testified, is excellent. Keene will pay for any needed childcare.
 {¶ 12} The mother testified that she did not graduate from high school and has not obtained her high school graduate equivalency degree. Her son, Anthony, attends Meister Road Elementary School in Lorain and has had problems sitting still, listening, and paying attention. These problems appeared to become exacerbated after she went to California and left him with his father.
 {¶ 13} She further testified that Ceccacci is a good father, but he can be uncommunicative about issues such as his finances and Anthony's school performance. During approximately 85% of the time that the children are residing in the father's home, he is not there and the children are being cared for by his girlfriend, Jill Smith, a dancer at a gentlemen's club in Detroit.
 {¶ 14} The mother next established that she worked as a loan processor but was laid off in 2000. She now works as a server at a restaurant and earns approximately $20,000 per year. She has unsuccessfully tried to find work in the financial field. In order to make enough money to support herself and the boys, she has to work evenings, so she does not get to spend much time with Anthony who is in school. The mother works 70-80 hours per week when the children are with their father in order to earn enough to support the family.
 {¶ 15} The father lost his job in July 2002, and stopped paying child support. He told the mother that he would maintain the children's health care but she later learned that he did not do so. In response, the mother decided to move to California in order to improve her family's financial situation. She has no family in Ohio. The mother also determined that there were good opportunities in California for the father to fulfill his dream of working in law enforcement. The mother obtained employment materials from the Los Angeles Police Department which indicate that it is currently recruiting and that it pays salary and benefits during police academy training.
 {¶ 16} In March 2001, before the father lost his job, the mother learned that the marital home was in foreclosure when she was named as a defendant in the foreclosure action. The debt was restructured but since that time, the loan has gone into default, and the father owes approximately $10,000 to the mortgage company. The father has claimed that he will sell the house, but he has not put it on the market.
 {¶ 17} The mother next established that she did not receive child support payments from August 5, 2002 until December 16, 2002. Payments stopped again in March 2003.
 {¶ 18} The mother further testified that the father began training to become a police officer in July 2001.
 {¶ 19} With regard to her position in California, the mother testified that she is an internal sales support representative for WMC. She has completed orientation and training, and her supervisor is pleased with her performance. She believed that she could earn a six figure income within the next few years. In addition to her salary, she receives commissions which, she believes, will increase, and also receives medical, dental, and vision benefits, as well as a 26 U.S.C. § 401(k) retirement package, a college savings benefit, disability insurance, and stock options.
 {¶ 20} The mother testified that, because she now has a better job, she is better able to provide for the children. They also have close friends and her sister's family in California. In addition, the mother's schedule is more flexible and the children have greater opportunities to participate in sports and other activities. Rent in California would be approximately double the amount that she pays here, but, she testified, the utility bills, including heat, electricity, and water, are far less, and the living conditions are resort-like. In Ohio, she had to obtain "Section 8 housing,"[1] because the foreclosures upon the marital residence harmed her credit. The woman testified that the children are lacking support from their father, and the move to California would be a better opportunity for her family.
 {¶ 21} With regard to the schools, the mother testified that she met with the vice principal of Mountainview Elementary School which the children would attend in California. The mother obtained the school handbook and other materials. She determined that the school had an "enormous budget," new, clean facilities, and computer, art, and music classes. The school also has resources for children with attention deficit disorder, a condition which, she feared, may affect Anthony. In addition, there is an on-site day care facility for Alex.
 {¶ 22} The mother presented evidence that the Meister Road School which Alex attends in Lorain has been in an "academic emergency" for the past two years, and has not met the state standard for proficiency tests. The school does not have a playground and the gymnasium also doubles as the cafeteria. Her low salary limits her ability to move to areas with better schools.
 {¶ 23} The mother testified that, while in California, she calls the children every other day, and also purchased postage-paid envelopes for them to mail letters to her. The children have not called her and the father has not made any effort to have the children communicate with her.
 {¶ 24} Finally, the mother stated that, if the motion is granted, she would agree for the boys to spend summer breaks and every other holiday with the father.
 {¶ 25} On cross-examination, the woman acknowledged that she had worked various part-time waitress jobs and that she spent $10,000, which she had received from Ceccacci's father when he bought out her interest in the marital home. She also acknowledged that because of the father's work schedule, his parents often watch the boys on the weekends, and his girlfriend often watches them during the week. She intends for the boys to have healthy relationships with their father and grandparents.
 {¶ 26} The father elected to present evidence. His father, Joseph Ceccacci, Sr., testified that the boys stay with him during overnight and weekday visits due to the father's schedule. He cooks, cleans and does chores with the boys and takes them on outings to the library and the park. He testified that he wrote the mother a letter, relayed to her through the father, in which he stated that the boys had a sense of family with his family. In response, the mother stated that Ceccacci and his wife would continue to have access to the children.
 {¶ 27} Ceccacci further testified that he paid $10,000 to the mother, on behalf of his son, for the buyout of the marital residence, and also gave his son $10,000 to stave off foreclosure of his home. The house is again in foreclosure, however, and his son and his girlfriend may move in with him due to their financial difficulties.
 {¶ 28} On cross-examination, Ceccacci stated that he has rheumatoid arthritis and lupus. He stated that he understood that the mother wanted to move because she believed that she could make a better life for herself and the boys, but he stated that he believed that he and his wife are the nucleus of the family. He admitted to giving his son money to pay child support, and also admitted that $11,000 is now due on the mortgage for the marital home.
 {¶ 29} Camille Ceccacci, the children's grandmother, testified regarding various family celebrations.
 {¶ 30} The father testified that he and the mother separated after he met his girlfriend, Jill Smith. He relies on Smith to take care of the boys when he cannot. The father stated that it is his dream to become a police officer and he has completed Police Academy training and received a Peace Officer Training Commission, following seven months training, in April 2002. He lost his job with Monlan Group in August 2002, where he earned approximately $48,000 per year. Since that time, he considered becoming a truck driver but he ultimately abandoned that because he believed the recruiter had made misrepresentations to him. In November 2002, he began working as a bartender at Dave 
Buster's. He also works three or four eight hour shifts for the LaGrange Police Department. He earns approximately $1,200 per month at Dave Buster's and $300 or $400 per month at LaGrange.
 {¶ 31} The father has taken civil service tests at various police departments in the Cleveland area. The job at LaGrange is exempt from civil service requirements and the father applied for a full-time position after one of the police officers retired, but he admitted that there was no actual job opening at the present time. He also sought a position with the Lorain County Sheriff's Department. He took the civil service test in Rocky River, but did not score well on the written test. He took the civil service test in Bay Village, but missed the physical agility test. He also sent a letter to the Perkins Township Police Department to inquire about a position there.
 {¶ 32} The father stated that, if he applied for a job at a police department in Los Angeles, he would not receive additional points for having completed training in Ohio, but he acknowledged that he would receive credit for his prior military service. He stated that it would take approximately eighteen months to be hired there. He admitted, however, that he would be paid for attending the police academy.
 {¶ 33} The father also testified that it would be difficult for him to move away from his parents, and that his girlfriend's family lives in Ohio.
 {¶ 34} On cross-examination, the father admitted that he attended the police academy in July 2001 and also began taking law enforcement classes at Cuyahoga Community College. In April 2002, he began to work at LaGrange. He earns approximately $9 per hour but, through his training period, he worked 16 hours per month without pay. Added with his earnings at Dave Buster's, he earns approximately $20,000 per year. Contrary to what he indicated to Nancy Huntsman, Ph.D., of the Family Conciliation Service, the father stated that he does not want to move to Los Angeles.
 {¶ 35} The father also admitted that, after he was terminated from his job at Monlan Group, the children were without health insurance. He told the mother that he would obtain benefits for them through COBRA but he did not do so. He claimed that he and the children will be covered by health insurance in the next month. He also admitted that the last time he had made a mortgage payment was September 2002, and that he did not pay child support from August 2002 until December 2002.
 {¶ 36} The father testified that he pays his child support through his girlfriend's checking account and that they co-mingle their funds. He admitted that his girlfriend spends more time with the children than he does.
 {¶ 37} With regard to the impending foreclosure of his residence, the father indicated that he has considered moving in with his parents or renting an apartment near them.
 {¶ 38} Jill Smith testified that she works as a dancer in Romulus, Michigan. She claimed that she earns approximately $30,000 per year. She has written checks for the father's child support payments from her checking account and contributes to the household expenses. Smith has not told the children what she does for a living and she does not want to move unless compelled to do so.
 {¶ 39} Nancy Huntsman, Ph.D., of the Family Conciliation Service, testified as a court witness and stated that she met with the mother, the father, the father's girlfriend, the children, and Dawn Hodge who watches the children for the mother. Huntsman testified that, while it was her opinion that the parents should remain in Ohio, it was her "unspoken dream" that if the motion is granted, that the father should follow the mother to California. Huntsman claimed that the children are "imbedded in the community," that Cleveland was the "secure base" for the children, and that the "parental combination" was the most important thing for them. She acknowledged, however, that if the children are forced to move due to the foreclosure of the marital home, this is a significant change, and such changes, including a change in school, makes such "imbedding" less of an influence.
 {¶ 40} In her report, Huntsman wrote that the mother "anticipates a six figure salary with eyes shining." Huntsman did not know, however, that the mother had actually gone to California and secured the job which she sought. Huntsman also acknowledged that, if a course of action is not in the best interests of the parents, this will impact the children, and that there will be a cost associated with losing the mother's opportunity in California, as well as the father's failure to realize his dream of becoming a police officer. Huntsman claimed that she was "actively instructed not to discuss money or economic circumstances," but she admitted that economic conditions "have a great deal to do with one's quality of life."
 {¶ 41} Huntsman admitted that, the during much of the time that the children were to be with the father, they were actually in the care of his girlfriend or his parents, and she admitted that extended family relationships should not have primacy over the parental relationship. She also admitted that, under the proposed relocation, the mother would be available to her children on evenings and weekends which would be a benefit to them.
 {¶ 42} The magistrate subsequently determined the mother and the children would have an "improved economic outlook" if she relocates to California, that "it is not an idle dream to expect that she could soon reach a six figure income," and that the "only harm foreseeable if the move is not permitted is that the parties remain geographically imprisoned in a downward economic spiral." The magistrate further acknowledged that the father is "voluntarily underemployed," that the marital home where he resides is in foreclosure, that he did not make house payments or support payments for months, and that he failed to obtain health care for the children and falsely indicated that he had done so. The magistrate then determined that "[t]here is no merit to any reallocation of parental rights in this case[,]" and recommended that the motion to relocate be denied. The magistrate also denied the father's motion to modify child support, and determined that the father was in contempt of court but permitted him to purge the contempt by executing an affidavit to indicate that the mother was not responsible for the default of the marital residence, by providing health insurance for the children, and by paying his support obligations and arrearage.
 {¶ 43} The mother filed objections to the magistrate's decision. On October 10, 2003, the trial court overruled the objections and entered judgment as recommended by the magistrate. The mother now appeals and assigns a single error for our review.
 {¶ 44} The mother's assignment of error states:
 {¶ 45} "The trial court erred in denying Appellant's motion to relocate with the minor children to the state of California."
 {¶ 46} Within this assignment of error, the mother asserts that the lower court abused its discretion in denying the motion to relocate. We agree.
 {¶ 47} At the outset, we note that a parent has a constitutional right to live anywhere in the country that she chooses and to relocate at will. Miller v. Miller, Henry App. No. 7-03-09, 2004-Ohio-2358. If the residential parent intends to move to a residence other than the residence specified in the court decree, the court may schedule a hearing to determine whether it is in the best interest of the child to revise the parenting time schedule for the child, R.C. 3109.051, and to decide if the visitation schedule should be revised. Spain v.Spain (June 21, 1995), Logan App. No. 8-94-30; Eaches v.Eaches (July 3, 1997), Logan App. No. 8-97-05.
 {¶ 48} R.C. 3109.04 governs the determination of whether modification of a shared parenting plan is warranted. Harbottlev. Harbottle, Summit App. No. 20897, 2002-Ohio-4859. A trial court's application of this statute to the facts of a particular case will not be disturbed on appeal absent an abuse of discretion. Id. "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable."Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219, 482,450 N.E.2d 1140, 1142.
 {¶ 49} Pursuant to R.C. 3109.04(E),
 {¶ 50} "(1)(a) The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds * * * that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a modification is in the best interest of the child and one of the following applies:
 {¶ 51} "* * *
 {¶ 52} "(iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child."
 {¶ 53} Where a divorce decree or shared-parenting plan expressly or impliedly prohibits the removal of the parties' children from the jurisdiction, the burden is upon the parent seeking relocation. See Hauck v. Hauck (Mar. 31, 1983), Cuyahoga App. No. 44908, unreported.
 {¶ 54} In determining a child's best interest, the trial court must consider "all relevant factors," R.C. 3109.04(F)(1), including, the following:
 {¶ 55} "(a) The wishes of the child's parents regarding the child's care;
 {¶ 56} "* * *
 {¶ 57} "(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
 {¶ 58} "(d) The child's adjustment to the child's home, school, and community;
 {¶ 59} "(e) The mental and physical health of all persons involved in the situation;
 {¶ 60} "(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;
 {¶ 61} "(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;
 {¶ 62} "* * *
 {¶ 63} "(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state. R.C. 3109.04(F).
 {¶ 64} In addition, an unstable economic situation and unstable housing are not in a child's best interest. In reMeyer, Warren App. No. CA2002-05-048, 2003-Ohio-83. Moreover, in considering a motion to relocate a trial court is permitted to consider that the relocation is to secure more stable employment and to provide health benefits for the children. Cf. Rohrbaughv. Rohrbaugh (2000), 136 Ohio App.3d 599, 737 N.E.2d 551.
 {¶ 65} In this matter, the lower court noted that in ruling upon a motion to relocate, economic enhancement of the standard of living had been recognized by jurisdictions other than Ohio. Considering such factors enunciated in other jurisdictions, the lower court noted:
 {¶ 66} "The advantages of the proposed move center around the family's economics. The parties stipulated that were Timra to remain here in Northeast Ohio and Joe to continue to earn at his present level, each would only make about $20,000 per year. In California, despite a higher cost of living, on Timra's expected income alone, the parties would have significantly more money. Timra also presented evidence on schools and nice neighborhoods — but these too are a function of an improved economic outlook.
 {¶ 67} "* * *
 {¶ 68} "The court is convinced that Timra's quality of life would be enhanced by her success economically and emotionally by a move to California * * *.
 {¶ 69} "* * * The only `harm' foreseeable if the move is not permitted is that the parties remain geographically imprisoned in a downward economic spiral. That alone is not enough despite everyone's wish that it were so."
 {¶ 70} We hold that the lower court abused its discretion and committed reversible error. Economic conditions must be considered where, as here, they are relevant. See R.C.3109.04(F)(1); In re Meyer, supra. Under the circumstances of this case, the children were shown to be living in economically stressed circumstances. The court's own findings demonstrate that: the father borrowed $10,000 from his father to prevent foreclosure of his residence; the house is again in foreclosure, after the father was terminated from Monlan Group; he falsely represented to the mother that the children had continued health care under COBRA; the mother has to work 70-80 hour weeks when the boys are with their father in order to support herself; the father is voluntarily underemployed; and the father is "temporizing for the law enforcement job he believes is only weeks away." In addition, the record clearly demonstrates that mother must work extremely long hours when the boys are not with her in order to live at a minimal level, that she lives in Section 8 housing due to her earnings and poor credit caused by the father's failure to pay the mortgage, that she cannot afford to move to an area with better schools, and that the father has not complied with court orders pertaining to child support and health care. While in the father's care, the children are cared for primarily by his girlfriend and, due to the impending foreclosure of the father's residence, it is unclear where they will live while in his care. The record also demonstrates that the mother can improve her economic circumstances in California and this, in turn, will improve the boys' lives by allowing them to live in better conditions, attend a better school which, in the very words of the trial court, "are a function of an improved economic outlook." In addition, the mother will have more time available for activities for the children.
 {¶ 71} This court cautions that it is not adopting a per se rule which allows financial resources to become a shorthand for the best interests of the children. Under the circumstances of this case, however, the dire economic condition is longstanding, with consequences to the children's education, living conditions, health care, and support, and a better alternative has been shown. In this matter, the proposed move to California will give the children an opportunity for a more stable and less impoverished upbringing and will make them less likely to be subjected to upheavals of their lives such as are engendered by the foreclosure of the marital home and the uncertainty of the father's living arrangements, and the father's failure to abide by orders of the lower court pertaining to support and health insurance.
 {¶ 72} In light of the foregoing, we hold that a change in circumstances has occurred, modification of the shared parenting plan is in the children's best interests, and any harm from such a change would be outweighed by the advantages to the children. We further hold that, due to the chaotic environment created by the actions and inactions of the father, and the mother's diligent efforts to improve the quality of life for the children, that it is in the children's best interest that custody be modified in order to give the primary residential parenting responsibility to the mother. We therefore reverse the order of the lower court which denied the motion to relocate and remand the matter for additional proceedings in order for the trial court to enter an order giving the mother primary residential parenting responsibility and establishing a visitation schedule for the father.
 {¶ 73} Reversed and remanded for further proceedings consistent with this opinion.
[1] "Section 8" refers to the federally-funded Department of Housing and Urban Development (HUD) program established in42 U.S.C.S. 1437f.