[Cite as *In re A.B.M.*, 2019-Ohio-3183.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE A.B.M.

A Minor Child

[Appeal by T.M., Father]

:
:
:
:
:

Case No. 107556

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 8, 2019

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. CU16117933

---

### *Appearances:*

Stafford Law Co., L.P.A., Joseph G. Stafford, and Nicole A. Cruz, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Daniel A. Starett and Marilyn Weinberg, Assistant County Prosecutors; and Eric J. Cherry, *for appellee.*

ANITA LASTER MAYS, J.:

{¶ 1} Appellant T.M., the established father ("Father") of minor child A.B.M., appeals the custody determination by the Cuyahoga County Court of Common Pleas, Juvenile Division. We affirm the judgment of the trial court.

## I.    Background and Facts

{¶ 2}    A.B.M. was born to appellee M.R., a single mother ("Mother"), shortly after Mother's high school graduation.   Father was also a recent high school graduate.  On March 11, 2014, Father was established as the biological father by the Cuyahoga County Department of Job and Family Services ("CCDJFS"). The parties never married but lived together sporadically.

{¶ 3}    After several moves from Florida to Ohio, Father decided to remain in Ohio.  Mother decided to remain in Florida.  On December 12, 2016, Father filed an application to determine custody of A.B.M. and a motion to restrain Mother from returning to Florida after Mother's visit to Ohio.  Father alleged that Mother:  (1) was unable to provide stable living conditions, (2) had not maintained stable employment for more than three months in the past two years, and (3) A.B.M., who was four years of age at the time, had not been in a structured school environment.

{¶ 4}    The trial court granted the ex parte motion filed by Father on March 17, 2017, to restrain Mother from returning to Florida where she and A.B.M. were residing.  An interim parenting order was issued governing visitation.

{¶ 5}    On March 29, 2019, the trial court denied Mother's motion to dismiss the complaint for lack of subject matter jurisdiction that claimed Ohio lacked jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") because Mother was a Florida resident.  The trial court determined that Mother

> failed to demonstrate by clear and convincing, credible evidence that she has established or otherwise maintained residency in another

[s]tate, and thereby establishing another [s]tate as the home state of the child. Both parents demonstrated a rather transient lifestyle with the child prior to the filing of the application.

Journal entry No. 0911060800 (Mar. 29, 2019).

{¶ 6} The trial was held on April 25, 2018. Father, Mother, the maternal grandmother ("Grandmother") and the GAL testified.

{¶ 7} Father stated that he, Mother, and A.B.M. resided together before he moved in with a friend in Florida in January 2015, and secured employment. Mother and A.B.M. joined him shortly afterward. Father testified that he paid all of the expenses and assisted with A.B.M.'s care. Father returned to Ohio in August or September 2015, without Mother and A.B.M., but gave Mother $400 per month to support A.B.M. when he obtained employment.

{¶ 8} Father visited A.B.M. in Florida during the fall 2015 and during Mother's visit to Ohio to see her mother in March 2016. A.B.M. stayed with Father and his new fiancé in Cleveland for about two months later that year with Mother's consent.

{¶ 9} Father testified that Mother was pregnant with the child of her fiancé whom she lived with in Florida and that Father paid for Mother and A.B.M. to come to Ohio in December 2016. Mother stayed alternately with Father's sister and her sister. Father filed the custody application and the trial court ordered interim visitation. Father requested equal parenting time and designation as the residential parent if Mother relocated out-of-state.

{¶ 10} Father admitted that A.B.M. was four years old at the time the case was initiated and was not required to attend school. Mother selected A.B.M.'s current school where she is learning to speak Mandarin and Spanish and A.B.M. enjoys attending school with her cousins. Father states that he assists A.B.M. with homework during his visitation time and maintains contact with the school regarding A.B.M.

{¶ 11} Father testified that A.B.M. said that Mother told her not to discuss Mother's life and activities with Father. He claimed that Mother did not obtain stable housing until April 2017, though he admitted that she was in Florida and subsequently stayed with relatives until she secured a place to live. Father confirmed that he had also moved and purchased his home in 2017 where he lives with his fiancé.

{¶ 12} Exhibits were also introduced during Father's testimony indicating that, at the time the complaint was filed, he had contact with A.B.M., that actions were in process for A.B.M.'s school enrollment, and that he stopped paying the $400 per month that he indicated he had been paying to Mother. The 2015 W-2 forms did not support Father's claim that Mother and Father resided together in 2015.

{¶ 13} Mother testified that she and her family moved to Ohio from Florida during her sophomore year and that she has extended family in Florida. During the pregnancy and after the birth, Mother lived primarily with Grandmother but sometimes stayed with Father who frequently "kick[ed] [Mother] out" of the house. (Tr. 100.) Mother said that she always planned to return to Florida and moved in

with her brother in February 2015. Father resided about 30 minutes away, they were not dating, and they did not live together at that time.

{¶ 14} Mother drove A.B.M. to visit Father but Father did not ask to see A.B.M. or pick her up. Father's move to Florida provided an opportunity for her to return to her family in Florida. In May 2015, Mother secured employment and, in June, an apartment. Father had returned to Ohio by that time but returned to Florida to live with Mother on the condition that he obtain employment.

{¶ 15} Father worked for about a month and the parties ended the living arrangement after an argument that involved police presence. Father returned to Ohio and Mother moved back in with family in Florida. Father talked with A.B.M. by telephone, video chat, and visited A.B.M. in Florida. Mother ended her employment because of the one-hour commute and said that she supported herself with savings, a tax refund, and subsequent employment that allowed her to meet A.B.M.'s needs.

{¶ 16} Mother and her current fiancé began living together about one month after meeting and they planned to marry in January 2019. The fiancé is the father of the second child and has a good relationship with A.B.M. Mother returned to Ohio to help Grandmother move back to Florida but remained due to the custody case and began taking classes at a local college.

{¶ 17} Mother testified that the only violation of the current parenting order occurred on July 4, 2017. A.B.M. was usually happy to see Father but was cranky and did not want to go with Father. Father began yelling and A.B.M. was crying and

did not want to leave. Mother denied attempting to hinder the father-child relationship.

{¶ 18} Mother also testified that, in December 2016, when Mother was residing at Father's sister's house, Father attempted to have Mother perform a sexual act. Mother did not report it. Mother continued to allow visitation pursuant to the parenting order but had other family members take A.B.M. to meet Father. Also, in December 2016, A.B.M. told Mother that she observed a gun laying on a kitchen chair at the Father's home, but that Father quickly removed it.

{¶ 19} Mother testified that, after the gun incident, she allowed A.B.M. to talk with Father by telephone but she was concerned for A.B.M.'s safety as well as for her own. Since the interim parenting order was entered, A.B.M. visits Father and is sometimes excited and other times reluctant to go. Mother also said that A.B.M. is very close to her younger sister.

{¶ 20} During cross-examination, Mother explained the reasons for changing residences and employment relocations and stressed that she always made sure that A.B.M.'s needs were met. Though Mother's family and fiancé are in Florida and Grandmother was also moving to Florida, Mother declared that she would remain in Ohio if Father was appointed as the residential parent because she did not want to be away from A.B.M. Mother testified that her current employer, Cleveland Clinic, would allow her to continue to work for them in a home-based position if she relocates to Florida. If forced to remain in Ohio, her relationship with her fiancé

probably would end because he has a special needs child in Florida and is unable to relocate.

{¶ 21} Grandmother testified that Mother and Father had a sporadic and somewhat contentious relationship that Mother attributed to their youth and the stress of parenting an infant. Grandmother was diagnosed with fibromyalgia and was advised by her physician to move to a warmer climate. Mother returned to Cleveland to assist Grandmother's move to Florida.

{¶ 22} After the order was issued preventing Mother from returning to Florida, Mother secured an apartment in the complex where Grandmother resides and Grandmother cares for both children. Grandmother advised that A.B.M. and her younger sister are very close and that separating them would be devastating.

{¶ 23} The GAL was the final witness. The GAL issued a report on November 29, 2017, that did not contain a parenting recommendation. On December 7, 2017, only eight days later, she issued a longer report that recommended naming the Father as the residential parent for school purposes and for a split-week parenting plan with exchanges at the school. The GAL did not file an updated or supplemental report prior to the April 2018 trial.

{¶ 24} The GAL testified,

I've done a number of visits with the child. Both homes are appropriate. The child is very comfortable with both parents, very affectionate. She clearly loves her mom and her dad.

She gets along well with father's fiancé. She clearly adores her little sister.

She I think wants to spend time with everybody, to love everybody, like any other six-year-old.

I think the big issue in this case is how we handle the relocation, which is very, very tricky.

I am hesitant to recommend that and I think that's clear in my report, based on mom's difficulty dealing with dad throughout this case.

I will note that it has improved significantly since I was appointed. When this case began, mother * * * did not want any interaction with [Father].

(Tr. 164-165.)

{¶ 25} The GAL opined that both parents are competent to care for A.B.M. However, "[m]y concerns are their ability to work together to facilitate positive relationships for [A.B.M.] with everyone." (Tr. 168.) In light of the strained communication between the parents, the GAL suggested that visitation exchanges take place through the school to avoid interaction between the parents and that the parties continue to communicate through the Our Family Wizard database that facilitates shared parenting communications.

{¶ 26} The GAL concluded that spending time with both parents is in A.B.M.'s best interest, but A.B.M. should not hear negative things from either parent about the other parent. The GAL suggested that A.B.M. had been coached by Mother about the gun incident because the child recalled the situation even though she was only five. The GAL did not think that seeing a gun sitting on a kitchen chair at her Father's home would be something that a five-year-old child would remember, but the GAL admitted that she did not "know for certain." (Tr. 175.)

{¶ 27} The GAL also believed that A.B.M. was hearing negative things about Father from Mother because the child referred to Father by his first name. "He wasn't 'daddy' to her. And to me, when I hear words like that out of a child's mouth, they're being repeated." (Tr. 165.)

{¶ 28} Father told the GAL that he did not recall the gun incident but admitted that he owns a gun. The GAL could not recall exactly where the Father said that he kept the gun, but said that the Father subsequently purchased a lockbox to keep the allegedly unloaded weapon in.

{¶ 29} The GAL could not recall the name of the Florida city where Mother planned to move but remembered that Mother was not going to move in with her fiancé because she wanted A.B.M. to attend a better school system. The GAL also said that Mother did not inform her that she would have employment in Florida or that she had located housing for her return to Florida "so it was all very much theoretical." (Tr. 170.) After the second report, the GAL did not ask Mother whether there had been any changes regarding the plan to move to Florida because she assumed that Mother or her counsel would advise her.

{¶ 30} Counsel for Mother asked what transpired during the eight-day period between reports that resulted in the current recommendation. The GAL responded that she had not been able to examine Father's residence because he was just moving in and she wanted to allow the parents "a little time" to attempt to work out a parenting plan because parties are more inclined to compromise closer to a trial date.

{¶ 31} The GAL also added in the second report that she did not believe Mother's fiancé was "a significant person" in A.B.M.'s life at the time, but confirmed that A.B.M. and her Mother were living with the fiancé and that A.B.M. referred to the two children of the fiancé as her brothers. The GAL attributed the familial label to the Mother's influence because the GAL thought that she recalled Mother telling her that A.B.M. was encouraged to consider the fiancé and his children to be family.

{¶ 32} Both parties informed the GAL that visitation stopped for six months in December 2016. Father did not have a reason but Mother said it was due to the gun incident. The GAL also noted in her second report that she found it odd that the Mother did not report the alleged attempted sexual assault by Father though she had reported the prior alleged acts of domestic violence.[1]

> Counsel: Do you have any expertise in dealing with victims of domestic violence or sexual assault?
>
> GAL: Outside of my dealings as a [GAL] and as an attorney, no.
> * * *
> Counsel: So this odd reaction, that's your own just personal opinion?
>
> GAL: It is based off of mother's previous reactions to alleged domestic violence.
>
> Counsel: Do you think domestic violence and sexual assault are the same things?
>
> GAL: I think they are related.

(Tr. 179-180.)

---

[1] According to the report, the GAL had been provided with Florida police reports and a domestic violence petition for injunction form.

{¶ 33} The GAL also stated that she did not update her report from "A.B.M., seems to more or less like her new sister, plus the child is still an infant" to reflect that a "bond has developed" between A.B.M. and her infant sibling because it was a minor change that would not alter the GAL's recommendation. (Tr. 183-184.) The GAL expressed concern that a rift would grow between the child and Father if Mother moved to Florida due to the distance and strain in parental communications.

{¶ 34} The trial court awarded equal parenting time to Father and Mother, designated each parent as the legal custodian and residential parent during their respective parenting times, and designated Mother as residential parent for school purposes. Father was ordered to pay child support of $214.47 per month and was also required to provide health insurance. The trial court also set forth parenting time in the event the Mother chose to move to Florida after filing a notice of intent to relocate.

{¶ 35} Father appeals the trial court's judgment.

## II. Assigned Error, Law, and Discussion

{¶ 36} Father assigns a single error for review: the trial court erred as a matter of law and abused its discretion in its allocation of parental rights and responsibilities. We do not agree.

{¶ 37} Father contends that the trial court failed to consider the best interests of the child factors under R.C. 3109.04(F)(1) as required by R.C. 2151.23(F)(1), which provides that the "best interest standard of R.C. 3109.04 applies in initial actions to allocate parental rights cases involving children of

unmarried parents." (Citations omitted.) *In re A.M.S.,* 8th Dist. Cuyahoga No. 98384, 2012-Ohio-5078, ¶ 19. R.C. 3109.04(F)(1) contains a nonexhaustive list of factors that the trial court may consider in reaching a resolution. The "statute expresses a strong presumption that shared parenting is in the best interest of the child." *Kong v. Kong,* 8th Dist. Cuyahoga No. 93120, 2010-Ohio-3180, ¶ 6, citing *Dietrich v. Dietrich,* 8th Dist. Cuyahoga No. 90565, 2008-Ohio-5740.

{¶ 38} The discretion of a trial court in a custody determination is broad, but "it is not absolute, and must be guided by the language set forth in R.C. 3109.04." (Citations omitted.) *Miller v. Miller,* 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). We are certainly cognizant that "[c]ustody issues are some of the most difficult decisions a trial judge must make." *Id.* It is for this reason that the trial court's decision will not be reversed absent an abuse of discretion. *Id.* An abuse of discretion implies that the trial court's "attitude was unreasonable, arbitrary, or unconscionable." *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

{¶ 39} R.C. 3109.04 provides in pertinent part:

(1) In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and

responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

R.C. 3109.04(F)(1).

{¶ 40} In addition, the statute provides:

(2) In determining whether shared parenting is in the best interest of the children, the court shall consider all relevant factors, including, but not limited to, the factors enumerated in division (F)(1) of this section, the factors enumerated in section 3119.23 of the Revised Code, and all of the following factors:

(a) The ability of the parents to cooperate and make decisions jointly, with respect to the children;

(b) The ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent;

(c) Any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent;

(d) The geographic proximity of the parents to each other, as the proximity relates to the practical considerations of shared parenting;

(e) The recommendation of the guardian ad litem of the child, if the child has a guardian ad litem.

(3) When allocating parental rights and responsibilities for the care of children, the court shall not give preference to a parent because of that parent's financial status or condition.

R.C. 3109.04(F)(2)-(3).

{¶ 41} Father contends that the trial court failed to set forth any findings of fact or conclusions of law regarding those factors. The trial court recited a

comprehensive list of factors in the journal entry that were considered in reaching a determination.

The prior interaction and interrelationships of the child with the child's parents, siblings, and other persons related by consanguinity or affinity of the child;

The geographical location of the residence of each parent and the distance between those residences;

The child's and parents' available time, including, but not limited to, each parent's employment schedule, the child's school schedule, and the child's and the parents' holiday and vacation schedules;

The age of the child;

The child's adjustment to home, school, and community;

The health and safety of the child;

The amount of time that will be available for the child to spend with siblings;

The mental and physical health of all parties;

Each parent's willingness to reschedule missed parenting time and to facilitate the other parent's parenting time rights, and

With respect to a person who requested companionship or visitation, the willingness of that person to reschedule missed visitation;

Whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of the adjudication; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

Whether either parent has established a residence or is planning to establish a residence outside this state;

The wishes and concerns of the Child's parents, as expressed by them to the Court;

The recommendation of the guardian ad litem for the child;

Other factors relating to the best interest of the child: the parents have made significant efforts to stabilize their lives and relationship with and surrounding the child during the pendency of this litigation.

Journal entry No. 0911440943, page 1.

{¶ 42} The court concluded that

it is in the best interests of the child that the parents * * * be designated as the residential parents and legal custodians of A.B.M. during their respective parenting times. Mother should be designated as residential parent for school purposes.

*Id.*

{¶ 43} The trial court also cited the factors underlying its determination to appoint Father as the child-support and health-insurance obligor and that the child-support-guideline calculation should be reduced based on the parenting time allocation. These findings were also determined to be in the best interests of the child.

{¶ 44} This court has previously explained that

absent a Civ.R. 52 motion, a trial court need not make specific findings correlating to R.C. 3109.04(F) in the judgment entry. *See Harp v. Harp*, 12th Dist. Clermont Case No. CA89-08-075, 1990 Ohio App. LEXIS 1458 (Apr. 16, 1990). Further, an appellate court will presume regularity in the trial. *State v. Coombs*, 18 Ohio St.3d 123, 125, 480 N.E.2d 414 (1985). Therefore, generally this court would presume that the trial court considered the R.C. 3109.04(F) factors, unless there is reason to believe the trial court did not consider those factors. *See Bird v. Bird*, 5th Dist. Stark No. CA-6423, 1985 Ohio App. LEXIS 5761 (Feb. 19, 1985).

*Wilk v. Wilk*, 8th Dist. Cuyahoga No. 96347, 2011-Ohio-5273, ¶ 10.

{¶ 45} In the appellate brief, Father lists the factors that Father deems the trial court should have relied on and that purportedly support Father's argument that the trial court simply got it wrong. The trial judge presided over the trial in this case. We will not substitute our judgment for that of the trial court. Thus, we emphasize here that

> "'where there exists competent credible evidence to support an award of custody, there is no abuse of discretion. * * * *Davis [v. Flickinger,* 77 Ohio St.3d at 418, 674 N.E.2d 1159 (1997). This highly deferential standard of review rests on the premise that the trial judge is in the best position to determine the credibility of witnesses because he or she is able to observe their demeanor, gestures, and attitude. *Seasons Coal Co. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). This is especially true in a child custody case, since there may be much that is evident in the parties' demeanor and attitude that does not translate well to the record. *Davis,* 77 Ohio St.3d at 419, 674 N.E.2d 1159.'"

*In re A.M.S.,* 8th Dist. Cuyahoga No. 98384, 2012-Ohio-5078, ¶ 18, quoting *In re L.S.,* 152 Ohio App.3d 500, 2003-Ohio-2045, 788 N.E.2d 696 (8th Dist.).

{¶ 46} Father also argues that the trial court did not properly consider the GAL's testimony and recommendations. In custody proceedings,

> "[t]he role of a guardian ad litem in a permanent custody proceeding is to protect the child's interest, to ensure that the child's interests are represented throughout the proceedings and to assist the trial court in its determination of what is in the child's best interest. *See, e.g., In re C.B.,* 129 Ohio St.3d 231, 2011-Ohio-2899, 951 N.E.2d 398, ¶ 14, citing R.C. 2151.281(B) and Sup.R. 48(B)(1). This is accomplished by the guardian ad litem conducting an investigation of the child's situation and then making recommendations to the court as to what the guardian ad litem believes would be in the child's best interest. *In re J.C.,* 4th Dist. Adams No. 07CA833, 2007-Ohio-3781, ¶ 13."

*In re R.B.,* 8th Dist. Cuyahoga No. 107709, 2019-Ohio-1656, ¶ 14, quoting *In re K.Z.,* 8th Dist. Cuyahoga No. 107269, 2019-Ohio-707, ¶ 67.

{¶ 47} Sup.R. 48(D) lists the duties and responsibilities of a GAL. The rule does not serve as a checklist of activities in which the GAL must engage but it does furnish "good guidelines" for a GAL to follow in order to provide the trial court with a relevant and informed recommendation. *In re C.O.*, 8th Dist. Cuyahoga Nos. 99334 and 99335, 2013-Ohio-5239, ¶ 14, quoting *In re K.G.*, 9th Dist. Wayne No. 10CA16, 2010-Ohio-4399, ¶ 12. We also point out that the GAL report is advisory and "is not considered evidence." *In re T.B.-G.*, 8th Dist. Cuyahoga No. 106713, 2018-Ohio-4116, ¶ 15, citing *In re Sherman*, 3d Dist. Hancock Nos. 05-04-47, 05-04-48, and 05-04-49, 2005-Ohio-5888, ¶ 29; *In re K.W.*, 2d Dist. Clark No. 2013-CA-107, 2014-Ohio-4606, ¶ 17.

{¶ 48} The GAL submitted two reports dated less than two weeks apart but did not submit an updated report shortly before the April 25, 2018 trial. At the trial, the GAL was examined and cross-examined on the basis for her recommendation. *See In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, syllabus. The recommendation of the GAL is only one of the factors the trial judge may consider under R.C. 3109.04(F)(2)(e).

> "It is well settled that a trial court is not bound by the GAL's recommendations." *Brown v. Heitman*, 3d Dist. Logan No. 8-16-21, 2017-Ohio-4032, ¶ 30. "'A trial court determines the guardian ad litem's credibility and the weight to be given to any report.'" *Id.*, quoting *Galloway v. Khan*, 10th Dist. Franklin No. 06AP-140, 2006-Ohio-6637, ¶ 70, citing *Baker v. Baker*, 6th Dist. Lucas No. L-03-1018, 2004-Ohio-469, ¶ 30.

*Severns v. Foster*, 3d Dist. Marion No. 9-18-21, 2019-Ohio-909, ¶ 47.

{¶ 49} Thus, the trial judge was free to accept, modify, or reject the GAL's recommendation and was in the "best position to determine the credibility of witnesses because he or she is able to observe their demeanor, gestures, and attitude." *In re A.M.S.*, 8th Dist. Cuyahoga No. 98384, 2012-Ohio-5078, ¶ 18, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

{¶ 50} We also find that it was well within the trial court's discretion to name Mother as the residential parent for school purposes. We reiterate that, absent a Civ.R. 52 request for findings of fact and conclusions of law, "the trial court did not need to engage in a factor-by-factor analysis of the R.C. 3109.04 best-interest standards." *Savage v. Savage*, 4th Dist. Pike No. 15CA856, 2015-Ohio-5290, ¶ 22. We "presume that the trial court considered the R.C. 3109.04(F) factors, unless there is reason to believe the trial court did not consider those factors." *Wilk*, 8th Dist. Cuyahoga No. 96347, 2011-Ohio-5273, ¶ 10.

{¶ 51} The record reveals that Mother selected the local charter school that A.B.M. is attending. A.B.M. is doing well in school, is acquiring foreign language skills, and enjoys attending with her cousins. Mother and the GAL testified that, if Mother relocated to Florida with A.B.M., Mother planned to reside in a reputable school district so that A.B.M. would receive a good education, even though Mother's fiancé did not reside in the preferred district.

{¶ 52} Finally, Father challenge the trial court's finding that "[s]hould mother choose to move to Florida and upon the filing of a notice of intent to relocate, Father shall have the standard long-distance parenting time." Journal entry

No. 0911440943, page 2.  Father asserts that the trial court failed to determine that relocating was in the child's best interest and the court did not consider the costs associated with the standard long-distance parenting schedule.

{¶ 53} "A parent has a constitutional right to live anywhere in the country that she chooses and to relocate at will." *Valentyne v. Ceccacci*, 8th Dist. Cuyahoga No. 83725, 2004-Ohio-4240, ¶ 47, citing *Miller v. Miller*, 3d Dist. Henry No. 7-03-09, 2004-Ohio-2358.  The record demonstrates that Mother intended to return to Florida unless Father was named as A.B.M.'s residential parent.  In fact, Mother has been restrained from returning by the injunction requested by Father asking that the trial court prevent Mother from returning to Florida with A.B.M. pending resolution of the case.

{¶ 54} Mother is originally from Florida where she has strong family ties. Grandmother, who has been caring for A.B.M. and her younger sibling, is also returning to Florida.  Mother and Father testified that Father and A.B.M. have visited and communicated over the years though there were no orders in place requiring visitation.  Mother transported A.B.M. to Father for visits when the parties were living in Florida.  After Father returned to Ohio, Father visited A.B.M. in Florida and Father and his fiancé were allowed to keep A.B.M. in Cleveland for two months.

{¶ 55} Father testified that he paid for the out-of-town visits and transportation.  Visitation was ongoing until the six-month period in December 2016 when the gun incident reportedly occurred and there was no parenting order

in place.  The subsequent parenting order was honored by the parties except for the single incident explained during the trial.

{¶ 56} The trial court's requirement that Mother file a notice of intent to relocate does not negate the right of Father to oppose the notice based on appropriate grounds.  *See, e.g., In re R.N.*, 8th Dist. Cuyahoga No. 87027, 2006-Ohio-4266, ¶ 11 (relocation alone does not constitute changed circumstances justifying a parenting modification).  Based on the evidence before us and the presumption afforded by the absence of findings of fact, we cannot say that the trial court abused its discretion in determining that the relocation is in the child's best interest.

## III.  Conclusion

{¶ 57}  This court finds that there is competent, credible evidence supporting our determination that the conclusion of the trial court is in the child's best interest. *In re A.M.S.*, 8th Dist. Cuyahoga No. 98384, 2012-Ohio-5078, ¶ 18, citing *In re L.S.*, 152 Ohio App.3d 500, 2003-Ohio-2045, 788 N.E.2d 696 (8th Dist.).   A trial court is "not required to detail every factor of a best interest analysis if the court's judgment is supported by some competent, credible evidence."   *In re J.C.P.*, 8th Dist. Cuyahoga No. 103133, 2016-Ohio-116, ¶ 53, citing *Blakeman v. Blakeman*, 4th Dist. Pike No. 07CA768, 2008-Ohio-2948, ¶ 18. "Because the court's decision with respect to the allocation of parental responsibilities is supported in the record, this court will not disturb it." *Id.* at *id.*

{¶ 58} The judgment of the trial court is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

MARY EILEEN KILBANE, A.J., and
RAYMOND C. HEADEN, J., CONCUR