**[Cite as *In re M.W.H.*, 2026-Ohio-1558.]**

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE M.W.H. | : | |
| | | No. 115498 |
| A Minor Child | : | |
| | | |
| [Appeal by Mother] | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART AND REVERSED IN PART
**RELEASED AND JOURNALIZED:** April 30, 2026

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. CU-16101300

### *Appearances:*

Ann S. Vaughn, *for appellant*.

EMANUELLA D. GROVES, P.J.:

{¶ 1} Appellant Mother ("Mother") appeals from the decision of the juvenile court denying her motions to terminate a shared-parenting agreement and suspend overnight parenting time with Father and the decision holding Mother in contempt of court. For the reasons that follow, we affirm in part and reverse in part.

**Factual and Procedural History**

{¶ 2} In April 2016, the juvenile court approved and entered an agreed shared-parenting order executed by the parties. As a result, the juvenile court designated them both as legal custodians of MWH (the "minor child") (d.o.b. 4/10/2012), and Mother was designated as the residential parent. Pursuant to the agreement, Father's parenting time was weekly from Thursday at 5:30 p.m. to Sunday at 12:00 p.m.

{¶ 3} In October 2022, Father filed a motion to modify the shared-parenting agreement, which the juvenile court granted. In January 2023, the juvenile court accepted the parents' shared-parenting agreement, which designated both parents as residential and custodial parents of the minor child. Mother was designated the residential parent for school purposes only. The juvenile court's order also set Mother's parenting time from Sundays at 3:00 p.m. to Thursdays at 3:00 p.m., and Father's parenting time from Thursdays at 3:00 p.m., to Sundays at 3:00 p.m.

{¶ 4} On November 17, 2023, Mother simultaneously filed motions to terminate shared parenting, suspend overnight parenting time with Father, order Father to submit to drug and alcohol testing, and appoint a guardian ad litem ("GAL") for the minor child. Mother asked the court to order supervised visits and to suspend Father's parenting time. In her motion to terminate shared parenting, Mother asked the court to designate her as the minor child's sole legal custodian.

{¶ 5} Mother attached an affidavit, in which she alleged that she, her husband, and the minor child had observed Father intoxicated on several occasions at the minor child's sporting events. Further, Mother averred that the minor child told her that he had observed Father drinking and intoxicated. She expressed that multiple family members had raised concerns that Father was drinking, and she believed Father was driving the minor child while intoxicated. The minor child also reported to Mother there was no heat in Father's home and he was unable to bathe there because the water was off. Further, per Mother, the minor child reported that the home was "filthy." Mother claimed she saw the conditions of the home in the background during FaceTime calls with the minor child. Finally, Mother averred that the minor child wanted to discontinue visits because Father's home was "dirty, his dad drinks, and it's depressing."

{¶ 6} On November 27, 2023, Father filed a motion to show cause alleging that Mother had violated the shared-parenting agreement by interfering with his parenting time with the minor child during the month of November.

{¶ 7} The juvenile court appointed a GAL, and over the next several months conducted several pretrials. The juvenile court granted Mother's request for drug and alcohol testing and ordered Father to obtain the same within 30 days of the journalization of its March 4, 2024 order.

{¶ 8} In May 2024, the GAL issued her initial report. She noted that she had reviewed the court's records; the minor child's school attendance and report card from the past two years; and Father's bill payments for heat, water, and sewer.

She was able to speak to relevant parties and determined that the minor child had a decent relationship with both parents. However, the minor child expressed concerns about Father's living conditions and his drinking. The GAL attempted to schedule a visit to Father's home to assess the conditions, providing dates and times; however, at the time of her report, Father had not responded to her request.

{¶ 9} The GAL spoke to both Mother and Father. Mother reiterated her concerns as expressed in her affidavit. She also alleged that multiple family members of hers and Father's had reported concerns regarding Father's drinking. Finally, she alleged that Father's home had been foreclosed and sold.

{¶ 10} Father denied drinking, claiming he had a medical condition that prevented him from drinking. Father expressed concerns for the minor child's school attendance, calling it "atrocious" and alleging that the minor child had been reported to the state for truancy twice. When asked about the heating in his home, Father alleged that a thermocouple on his heater "went bad" and that the situation lasted for a little over a week. Subsequently, Mother took the minor child for a Halloween event. Shortly thereafter, the Cuyahoga County Department of Children and Family Services ("CCDCFS") began an investigation. Per Father, they conducted a home inspection and checked the gas, hot water, and living conditions and found the allegations "unsubstantiated." Two days later, Father went to get the minor child at school and was told Mother had pulled the minor child out of school early. He called the next day and was told the minor child was not in attendance. Subsequently, Father alleged that Mother interfered with his ability to attend

parent/teacher conferences, telling the school that they were to deal exclusively with her and no longer interact with Father.

{¶ 11} Based on the circumstances at the time, the GAL withheld her recommendation, indicating that she would reserve her conclusions until she had obtained additional information.

{¶ 12} Later that month, May 2024, the juvenile court determined that Father had not complied with its order to obtain a drug and alcohol assessment. The juvenile court reissued the order and gave Father another 30 days to comply. The juvenile court also granted the motion to suspend overnight visits at Father's home. In the alternative, the juvenile court noted that the parties could arrange for Father's parenting time to occur in the community, under supervision at a visitation center, or at the home of an appropriate adult known to the child.

{¶ 13} In January 2025, the GAL issued a second report. On speaking to the minor child this time, the minor child reported that he regularly visits with Father on the weekends and enjoys those visits. He did not report any present concerns regarding Father; however, he had not been to Father's home in "a long time" and did not know the current condition of the home.

{¶ 14} Mother reported to the GAL that she was aware that recent visits between Father and the minor child were appropriate. She acknowledged that they loved each other. She also noted that Father had been driving the minor child to various locations and there were no concerns. However, she disapproved of the minor child resuming overnight visits until Father proved he had appropriate and

stable housing. She reported that she had not received any recent reports from family members regarding Father's substance use or abuse.

**{¶ 15}** The GAL and Father corresponded by phone and email. Father emailed her a copy of a notice of bankruptcy dated September 2023, a copy of his drug screen results in May 2024, and results of a urine and toxicology screen conducted by the Cleveland Veteran Affairs Medical Center (the "VA") from August 2024. The VA reported negative results and did not recommend treatment. Although the GAL provided multiple days and times for a prospective home visit, Father did not make his home available to the GAL and she was unable to report on Father's living conditions. The GAL recommended that it was in the best interest of the minor child to continue visits with his Father "as ordered by the Court." The GAL reserved any additional recommendations until after the trial of the matter.

**{¶ 16}** Trial commenced in May 2025. The issues remaining were Father's motion to show cause and Mother's motion to terminate shared parenting. Additionally, Mother asked the court to continue its order forbidding overnight visits until Father addressed his housing issues.

**{¶ 17}** Father proceeded pro se and presented narrative testimony. He testified that after Mother picked up the minor child to take him to a Halloween event in 2023, Mother did not return him to Father's care. After that, Father alleged that Mother kept the minor child from him. In early November, Father filed a police report regarding the matter. Subsequently, Father and Mother were at the school for parent/teacher conferences and had to be separated. Father testified that school

officials were told he was no longer in the minor child's life and all communication was to go through Mother. Father had to bring copies of the custody orders to the school in order to rectify the matter. Ultimately, Father alleged that his parenting time was interrupted from October 26, 2023, through May 2024.

{¶ 18} Father also challenged Mother's claims that he had alcohol, drug, and mental-health issues when he had never been convicted of operating a vehicle while intoxicated ("OVI") or disorderly conduct or had any other legal issues in that vein. Nevertheless, Father acknowledged he was charged with a misdemeanor for growing marijuana in 2007. For reasons that Father did not explain, Father was ultimately convicted of arson.

{¶ 19} Father did not go into detail about his relationship with the minor child but noted that he was concerned about the minor child's grades and school attendance and had hired a tutor to help him. Finally, Father sought to introduce five exhibits: three affidavits from family members to attest to his character and the minor child's attendance records and test scores.

{¶ 20} On cross-examination, Father claimed that the minor child was unable to bathe for one day because a thermocouple in the water heater went out. Father explained that CCDCFS investigated his home and found everything acceptable. He also claimed that Mother was aware of the results of the investigation. Father admitted that he did not allow the GAL to inspect his home. He claimed that there was a scheduling conflict.

{¶ 21} Father further admitted that he had lived in the same home since 2004, but that it was foreclosed and sold in a sheriff's sale in September 2023. Nevertheless, Father claimed he was still the owner of the home. He acknowledged, however, that the county lists a different owner and that listed person is the legal owner. When asked if Mother should be concerned about the minor child staying with Father at a home owned by another person, Father replied "no" and indicated there was still a "process" pending. He pointed out that he has lived in the home for the past two years since the foreclosure, and he stated that "we" were in the process of figuring something out with respect to the house.

{¶ 22} Father then sought to call his fiancée, Ericka Reynolds ("Reynolds") to the stand. Mother objected, noting Father failed to file a witness list. The juvenile court overruled the objection and allowed the testimony.

{¶ 23} Reynolds testified that she had known Father for over 30 years and they began dating in March 2023 and became engaged in February 2025. She described the relationship between Father and the minor child as "best friends" and said that they have a relationship she admires. Reynolds testified that she owned her own home and had been to Father's home several times. They were discussing consolidating their lives to accommodate themselves, the minor child, and Reynolds' six-year-old son.

{¶ 24} With respect to Father's lifestyle, she testified that she would not describe him as someone with mental-health issues. She noted that Father did drink alcohol, but was imbibing less since he was prescribed blood pressure medication,

usually drinking nonalcoholic beer. She further noted that she had never seen Father smoke marijuana; however, she noted that she hated the smell and he would not smoke around her.

{¶ 25} Reynolds testified that she has spent time with the minor child. Specifically, he attended a family day celebration at her job. Later she was with Father when he bought the minor child a suit for his junior prom. Reynolds helped by hemming the minor child's pants. At the conclusion of her testimony, Father rested his case.

{¶ 26} Mother then took the stand. She testified that the minor child had just turned 13 years old. She and the minor child lived with her husband, Darren Wilder ("Wilder"), and her daughter. Mother admitted that the shared-parenting agreement had existed since 2016 and was modified in 2023. Although she had concerns about parenting time with Father, she did not act until October 2023, when the minor child raised some concerns.

{¶ 27} In October 2023, Mother picked up the minor child to take him to a Halloween event downtown and the minor child smelled "horrendous." She described the minor child smelling as if he had not bathed in days. She called Father to address the minor child's cleanliness and his drinking, which had been mentioned by the minor child and other members of both her and Father's families. She also tried to talk to him about not having hot water or gas and the home being in disarray and filthy. Finally, she told Father that because of those conditions, she would not bring the minor child back to his home. Father demanded that she return the minor

child, and she declined.  She later texted Father, telling him that she was not taking the minor child to his home given the conditions and he could contact her lawyer if he had questions.  The texts were entered as an exhibit during Mother's case-in-chief.

{¶ 28} Mother did not find out about the foreclosure of Father's house until later.  Father did not respond to her questions about the foreclosure.  Mother testified that the only thing that would satisfy her and alleviate her concerns about overnight visits was if he allowed the GAL to complete a home inspection.  She also expressed concern about what might happen if the new owner attempted to evict Father from the home while the minor child was present.

{¶ 29} Mother testified that Father did not communicate with her about the minor child or ask her about his well-being.  Further, Mother indicated that Father had not engaged in coparenting with her in the prior six months.   On the current visitation schedule, Mother complained that Father was usually late.  Father would communicate when he needed to cancel a visit, however.

{¶ 30} Finally, although Mother had indicated recent interactions with Father had been fine, she testified that he was noticeably intoxicated at the minor child's junior prom a week prior to trial.  She noted that he was in a "wobbly state," could not get up or stand-up straight, and was moving slow and slurring his words.  These new observations left her with renewed concern about allowing Father to drive with the minor child.  Nevertheless, she testified that she would be agreeable to overnight visits as long as they did not occur at "that house."  While she wanted

the minor child to have a relationship with Father, she wanted Father to be a good role model, sort out his housing "situation," and take care of his health.

{¶ 31} Next, Wilder testified and agreed that Father was inebriated at the junior prom the week prior. He described Father as sluggish and aggressive. The last time he was at Father's house was in 2022 or 2023. At that time, Wilder claimed that Father asked him to install a straight pipe for his gas line; he claimed it was a way to illegally access gas. Wilder testified he could not do it. At that time, Wilder entered the home and noticed that it was very cold. He also observed a vodka bottle in the middle of the basement floor and that the gas meter had been removed. On cross-examination, Wilder testified that he smelled alcohol on Father while at the junior prom. Further he acknowledged that he did not see Father drink from the vodka bottle and that it could belong to someone other than Father.

{¶ 32} At the close of testimony, the juvenile court addressed exhibits and asked Mother if she objected to the affidavits and records Father sought to admit. Mother objected to all of Father's exhibits. The juvenile court sustained the objections as to the affidavits Father obtained and the minor child's test scores but overruled the objection as to the minor child's attendance records. Father also objected to Mother's exhibits, which included the text messages she exchanged with Father about his living conditions and the docket of Father's foreclosure. The juvenile court overruled Father's objections.

{¶ 33} The GAL then gave her recommendation. She testified that it was in the best interest of the minor child for Father's motion for parenting time to be

denied.[1] With respect to shared parenting, she indicated that "this parent" cannot coparent. The GAL did not give a recommendation but stated that she did not believe shared parenting was working.

{¶ 34} When questioned by the parties, the GAL acknowledged that Father had completed the court-ordered drug and alcohol testing although he did so outside of the juvenile court's deadline. With regard to overnight visits, she believed that Father should have a home or lease in his name and the minor child should not stay in a home that does not legally belong to Father. Nevertheless, she admitted that in May 2024, Father provided her with water and sewer bills and receipts that he paid them.

{¶ 35} The juvenile court denied Mother's motions to terminate the shared-parenting agreement and suspend overnight visits and granted Father's motion to show cause, finding Mother in contempt of court. The juvenile court ordered that Mother serve three days in jail; however, the sentence was suspended and could be purged "by strictly complying with the terms of the shared-parenting plan of January 12, 2023 as ordered, and with daily school attendance, including educational supports such as tutoring and other extracurricular activities in the [minor child's] best interest."

{¶ 36} Mother appeals raising the following assignments of error for our review.

---

[1] The record reflects that the motion the GAL referenced was granted by the juvenile court in January 2023 and was not the subject of the hearing.

**Assignment of Error No. 1**

The [juvenile] court erred in finding that no substantial change of circumstances had occurred in the life of a child, the child's residential parent, or either of the parents subject to a parenting decree.

**Assignment of Error No. 2**

The [juvenile] court erred in finding that a modification was not necessary to serve the best interests of a minor child.

**Assignment of Error No. 3**

The [juvenile] court erred in denying [Mother's] motion to terminate the parties' shared-parenting [agreement].

**Assignment of Error No. 4**

The [juvenile] court abused its discretion in disregarding the recommendations of a [GAL] appointed to conduct an investigation and make recommendations about a minor child's best interest.

**Assignment of Error No. 5**

The [juvenile] court abused its discretion in finding by clear and convincing evidence that Mother was in contempt of court (pursuant to [Father's] motion to show cause).

**Assignment of Error No. 6**

The [juvenile] court erred in finding that Mother was in contempt of court (pursuant to [Father's] motion to show cause).

**Assignment of Error No. 7**

The [juvenile] court abused its discretion when giving self-represented Father leniency in overlooking his failure to meet the standards held to an attorney.

{¶ 37} For ease of analysis, we will address the assignments of error in combination or out of order.

## Law and Analysis

## Termination of the Shared-Parenting Agreement

{¶ 38} In the third assignment of error, Mother argues that the juvenile court abused its discretion when it denied her motion to terminate the shared-parenting agreement. Mother argues that she established that she and Father were unable to effectively communicate regarding joint parenting decisions, primarily because of Father's unwillingness to converse with her, and therefore the trial court abused its discretion when it denied her motion. We disagree.

{¶ 39} We review a trial court's best-interest determination for an abuse of discretion. *In re J.R.P.*, 2026-Ohio-827, ¶ 18 (8th Dist.). An abuse of discretion occurs when the court's conduct is "'unreasonable, arbitrary or unconscionable.'" *State v. Hill*, 2022-Ohio-4544, ¶ 9, quoting *State v. Beasley*, 2018-Ohio-16, ¶ 12, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). Furthermore,

> "[t]his highly deferential standard of review rests on the premise that the trial judge is in the best position to determine the credibility of witnesses because he or she is able to observe their demeanor, gestures and attitude."

*J.R.P.* at *id.,* quoting *In re L.S.*, 2003-Ohio-2045, ¶ 12 (8th Dist.), citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶ 40} A court of appeals is not permitted to substitute its judgment for the judgment of the trial court, where that judgment is supported by competent, credible evidence. *Bertalan v. Bertalan*, 2025-Ohio-1443, ¶ 70 (8th Dist.), citing *Hunter v. Troutman*, 2025-Ohio-366, ¶ 64 (8th Dist.).

{¶ 41} Our review of a motion to terminate a shared-parenting agreement is governed by R.C. 3109.04(E)(2)(c), which states:

> The court may terminate a prior final shared parenting decree that includes a shared parenting plan . . . upon the request of one or both of the parents or whenever it determines that shared parenting is not in the best interest of the children . . . .

{¶ 42} In making the decision whether to terminate a shared-parenting agreement, the sole concern of the trial court is the best interest of the child. *Bruns v. Green*, 2020-Ohio-4787, ¶ 20. The trial court need not find that there was a change of circumstances in order to make a ruling under R.C. 3109.04(E)(2)(c). *In re J.R.P.*, 2026-Ohio-827 at ¶ 14 (8th Dist.), citing *Bruns* at *id.*

{¶ 43} In examining whether shared parenting is in the best interest of the child, R.C. 3109.04(F)(2) instructs the juvenile court to consider "all relevant factors, including, but not limited to," the factors enumerated in R.C. 3109.04(F)(1), the factors enumerated in R.C. 3119.23, and all of the following: [2]

> (a) The ability of the parents to cooperate and make decisions jointly, with respect to the children;
>
> (b) The ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent;
>
> (c) Any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent;
>
> (d) The geographic proximity of the parents to each other, as the proximity relates to the practical considerations of shared parenting;

---

[2] R.C. 3119.23 applies to deviations in child-support orders and does not apply to the facts of this case.

(e) The recommendation of the guardian ad litem of the child, if the child has a guardian ad litem.

R.C. 3109.04(F)(2).

{¶ 44} The factors in R.C. 3109.04(F)(1) include:

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense

involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

{¶ 45} The sole factor Mother raises in this assignment of error is the inability of Father and Mother to communicate effectively and make joint decisions regarding the minor child under R.C. 3109.04(F)(2)(a). Nevertheless, the juvenile court's entry reflects that it considered all the factors listed in R.C. 3109.04(F)(1) and (2). Additionally, the GAL's final report noted that

[Mother] indicated that she is aware that her son has been having appropriate visits with his father. She said that her son loves [his] father and father loves the child. She said that the father has been driving the child around and no concerns were reported.

{¶ 46} Mother's only concern, as discussed with the GAL, was her desire to continue the suspension of overnight visits at Father's home until he establishes appropriate and stable housing.

{¶ 47} With respect to the remaining factors under R.C. 3109.04(F)(2), i.e., the ability of each parent to encourage the sharing of love, affection and contact between the child and the other parent; any history of abuse; and the geographic proximity of the parents to one another; neither party alleged that the other parent

interfered with their having a loving relationship with the minor child; there was no history of child abuse, parental abuse, domestic violence, or parental kidnapping; and the parents both resided within the Cuyahoga County area. R.C. 3109.04(F)(2)(b)-(d). Finally, the GAL encouraged a continued relationship between Father and the minor child but noted that there was no communication between the parents and that she did not believe "this parent" could coparent. The GAL did not believe shared parenting was working. However, neither in her report nor during her testimony did the GAL give examples of the parents' lack of communication and inability to make joint decisions regarding the minor child. Rather, the GAL offered testimony about the lack of communication between the GAL and Father. R.C. 3109.04(F)(2)(e).

{¶ 48} Regarding the R.C. 3109.04(F)(1) factors, at the trial Father indicated he wanted to continue the shared-parenting agreement. Mother indicated that she was satisfied with the juvenile court's decision to suspend overnight visits and would leave the determination regarding her motion to terminate shared parenting to the court. R.C. 3109.04(F)(1)(a). The GAL represented that the minor child wished to continue visiting with Father and loved Father; however, the GAL did not make any representation regarding how the minor child felt about the shared-parenting agreement. The court did not independently interview the minor child. R.C. 3109.04(F)(1)(b). The GAL reported that the minor child is well adjusted and seems to get along with Mother and Father. The GAL did not opine about the minor child's

relationship with Father's fiancée, her son, or the minor child's stepfather or siblings. R.C. 3109.04(F)(1)(c) and (d).

{¶ 49} Finally, with respect to R.C. 3109.04(F)(1)(e), the GAL did not report any issues with Mother's mental or physical health. The GAL noted that she had received documents from Father, establishing that he had completed drug and alcohol assessments, and no further treatment was recommended. Relating to either parent honoring the juvenile court's parenting order, the testimony established that Mother claimed Father failed to inform her if he could not get the minor child on time. Father testified that Mother withheld the minor child from his parenting time during November 2023. R.C. 3109.04(F)(1)(f). Neither party raised issues with child-support obligations. R.C. 3109.04(F)(1)(g). Neither party raised issues regarding prior criminal history nor claimed that either had acted in a manner that resulted in a child being an abused or a neglected child.[3] R.C. 3109.04(F)(1)(h). With respect to interference with parenting time, Father alleged that Mother interfered with his parenting time between October 2023 and May 2024. Mother did not make similar accusations. R.C. 3109.04(F)(1)(i). Neither party indicated they intended to establish a residence outside of this state. R.C. 3109.04(F)(1)(j).

{¶ 50} It was clear from the record that Father did not always respond to Mother's questions about conditions at his home, refusing to answer questions about the gas service per Mother's testimony. However, Wilder testified that Father

---

[3] Arguably, Mother alleged that Father's failure to have working utilities caused the minor child to be dependent while in his care; however, the GAL testified that Father showed bills and established he had working utilities as of May 2024.

sought his help with that issue and he visited the home. While Father was not forthcoming with Mother, he did not hide the condition of his home. Additionally, it was readily apparent from the record that visitation was going well since the juvenile court suspended overnight visits and the parties jointly attended the minor child's sporting events and major social events, like the minor child's junior prom. Mother testified that at the time of trial Father had not cooperated with her in any joint decisions in the prior six months but did not indicate what those decisions were and how they impacted the minor child.

{¶ 51} Based on the foregoing, we cannot find that the trial court abused its discretion when it denied the motion to terminate shared parenting. The third assignment of error is overruled.

**Modification of the Shared-Parenting Agreement**

{¶ 52} Next, we consider Mother's first, second, and fourth assignments of error, which challenge the juvenile court's denial of her motions to suspend Father's parenting time. Mother initially requested the juvenile court suspend parenting time, or in the alternative, allow supervised visits until Father addressed her claims regarding drug and alcohol abuse and lack of utilities in his home. After the trial court suspended overnight visits, Mother requested that the juvenile court continue suspending overnight visits until Father established that he had a safe and appropriate place to live.

{¶ 53} Changes to the terms of a shared-parenting order are governed under R.C. 3109.04(E)(2)(b), which provides, in pertinent part:

The court may modify the terms of the plan for shared parenting approved by the court and incorporated by it into the shared parenting decree upon its own motion at any time if the court determines that the modifications are in the best interest of the children or upon the request of one or both of the parents under the decree. Modifications under this division may be made at any time. The court shall not make any modification to the plan under this division, unless the modification is in the best interest of the children.[4]

{¶ 54} Similar to a ruling regarding the termination of shared parenting, the juvenile court bases the decision to modify a shared-parenting agreement on whether the modification is in the best interest of the child. *In re G.B.*, 2022-Ohio-382, ¶ 55 (8th Dist.). The court is not required to find that there was a change in circumstances. *Id.* *See Bruns*, 2020-Ohio-4787, ¶ 11 (Comparing R.C. 3109.04(E)(2)(a) and (b) with R.C. 3109.04(E)(2)(c) and stating, "Subsection (E)(2)(b) authorizes the trial court — on its own initiative or at the request of one or both parents—to modify the terms of the shared-parenting agreement when modification is found to be in the best interest of the child.").

{¶ 55} In her first assignment of error, Mother argues that the juvenile court erred when it found that there was no substantial change in circumstances in the lives of the child, the child's residential parent, or either of the parents subject to the parenting decree. However, whether there was a change in circumstances is only relevant when there is a request to change the residential parent under R.C. 3109.04(E)(2)(a). In this case, where Mother is the residential parent and she is making a request to modify the terms of the shared-parenting agreement under

---

[4] *Ramsey v. Ramsey*, 2014-Ohio-1921, ¶ 37 (10th Dist.) (finding that a request to modify parenting time is a request to modify the terms of a shared-parenting order).

R.C. 3109.04(E)(2)(b), the juvenile court was not required to consider changed circumstances. *G.B.* at ¶ 55. We are mindful that Mother's argument is based on the juvenile court's finding, that

> based on facts that have arisen since the prior decree, that a change in circumstances has not occurred in the [minor child's], the [minor child's] residential parent, or either of the parents subject to a parenting decree . . . .

(July 30, 2025 Journal Entry.)

{¶ 56} However, the juvenile court was not required to make this finding under R.C. 3109.04(E)(2)(b). Accordingly, Mother's first assignment of error is overruled.

{¶ 57} In the second assignment of error, Mother argues that the juvenile court's ruling was not in the best interest of the minor child. Specifically, she argues that the juvenile court's decision to "overlook" Father's failure to cooperate with the GAL's investigation was an abuse of discretion. Mother also alleges her request was reasonable, and the juvenile court erred when it denied the motion. In the fourth assignment of error, Mother claims that the trial court erred in disregarding the GAL's recommendations regarding what would be in the minor child's best interest.

{¶ 58} Again, our review of a trial court's best-interest determination is for an abuse of discretion. *J.R.P.*, 2026-Ohio-827 at ¶ 18 (8th Dist.), citing *In re N.J.V.*, 2025-Ohio-375, ¶ 35 (8th Dist.). The party seeking a modification of the parenting time schedule has the burden of establishing that the change is in the best interest

of the child. *Nungester v. Nungester*, 2017-Ohio-6935, ¶ 6 (3d Dist.); *Rankin v. Rankin*, 2021-Ohio-1967, ¶ 13 (10th Dist.)

{¶ 59} For the motion to modify, the question was whether it was in the best interest of the child to allow overnight visits based on Father's living conditions. During the trial, Mother submitted evidence that Father's home had been foreclosed and sold to a third party. Father admitted as much but alleged that the proceedings were "illegal" and that there were other legal proceedings pending to address the issue. Father did not submit any evidence to support these contentions.

{¶ 60} The GAL reported that Father impeded her ability to investigate his living conditions. She emailed Father on two occasions for a potential home visit. Father did not respond to the first email. With respect to the second, Father emailed the GAL a list of dates and times that he would be available. The GAL went to Father's home on one of those dates during a time Father said he would be available. Father was not home and he did not respond to the GAL's phone calls. When the GAL emailed Father to inquire about what happened, she did not get a response. The GAL noted that she did not know Father's living conditions inside the house, and testified that "outside, the grass and objects were around, so it didn't look like somebody was living there." Nevertheless, the GAL acknowledged that Father showed her utilities bills in his name as of May 2024, which was after the home's foreclosure and sale.

{¶ 61} There was no testimony presented regarding the current condition of Father's home. The minor child had regular visits after juvenile court suspended

overnight visits but informed the GAL that he had not been to Father's home in several months. Mother did not testify about the current conditions. She testified regarding what she observed while on FaceTime calls with the minor child during Father's parenting time. Those observations occurred prior to and in October 2023. Mother testified that the minor child would wander around the house when they talked and the house was "dirty." Nevertheless, Mother also testified that her main objection to overnight visits was that Father no longer owned the home. She was worried that the minor child would witness or experience an eviction or some action to remove Father from the home.

{¶ 62} Despite concerns about Father's drinking, Mother testified that she would be comfortable with overnight visits if they occurred in someone else's home, such as Father's cousin's home. Father's fiancée, Reynolds, testified that she had been to Father's home several times, but she did not address the conditions. She informed the court that she owned her own home, and she and Father were talking about how to consolidate their lives now that they were engaged to be married. Father attempted to ask Reynolds about the conditions of his home on redirect examination, but the juvenile court stopped him, explaining that he could not raise new issues on redirect examination.

{¶ 63} While we understand Mother's concerns about Father's living conditions, we cannot say that the trial court abused its discretion when it denied her motion. Mother did not object to overnight visits with Father; she objected to the location. Further, Mother's fears stemmed from speculation about what might

happen at Father's residence. Mother did not have any specific concerns except events that had happened prior to October 2023. While Mother had present concerns about Father's drinking, the GAL noted that the VA report indicated substance-abuse treatment was not recommended.

{¶ 64} Finally, a trial court is not bound by a GAL's recommendation. *In re A.B.M.*, 2019-Ohio-3183, ¶ 48 (8th Dist.) (finding "a trial court determines the guardian ad litem's credibility and the weight to be given to any report"). The juvenile court was free to accept, reject, or modify the GAL's recommendation and, like any other witness, was in the best position to determine the credibility of the GAL because of its ability to observe her demeanor, gestures, and attitude. *Id.,* citing *In re A.M.S.*, 2012-Ohio-5078, ¶ 18, citing *Seasons Coal Co.*, 10 Ohio St.3d at 80 (1984). Accordingly, the second and fourth assignments of error are overruled.

## Pro Se Practice

{¶ 65} In her seventh assignment of error, Mother argues that the juvenile court did not hold Father to the same standard as an attorney because it did not apply the juvenile rules and court's standing rules to Father. Specifically, she argues that the juvenile court should have granted her motion to deny Father's motion to show cause because Father failed to attach a copy of the order he alleged Mother violated. Further, Mother alleges that the juvenile court erred when it allowed Father to present Reynolds' testimony despite the fact that he had failed to file a witness list or otherwise notify Mother that he intended to present her testimony.

{¶ 66} While Mother cites the Ohio Rules of Juvenile Procedure and the Cuyahoga County Court of Common Pleas Standing Orders to support her argument, she does not cite any cases that support her argument that the failure of a court to enforce these rules is an abuse of discretion. Further, she does not cite any case law to support her argument that these acts, if improper, would warrant a reversal of the juvenile court's decision. "An appellant has the duty to construct the arguments necessary to support the assignments of error; an appellate court will not construct those arguments for the appellant." *Wells Fargo Bank, N.A. v. Kessler*, 2015-Ohio-5085, ¶ 13 (10th Dist.).

{¶ 67} Accordingly, Mother's seventh assignment of error is overruled.

**Contempt Finding**

{¶ 68} Finally, in the sixth assignment of error, Mother argues that the juvenile court erred in finding her in contempt of court. Although the assignment of error states that the juvenile court's finding was not supported by clear and convincing evidence, Mother admits that she interfered with Father's parenting time. Instead, she alleges that she was justified in preventing Father's parenting time because of the conditions at Father's home and because Father failed to communicate with her. Mother's arguments are well taken.

{¶ 69} An appellate court reviews a trial court's finding of contempt for an abuse of discretion. *In re J.A.P.*, 2022-Ohio-613, ¶ 15 (8th Dist.), citing *In re Contempt of Morris*, 110 Ohio App.3d 475, 479 (8th Dist. 1996), citing *Dozer v. Dozer*, 88 Ohio App.3d 296 (4th Dist. 1993). A juvenile court's authority to impose

contempt stems from R.C. 2151.21 and 2705.031(B). The moving party must establish (1) the existence of a court order, (2) that the party was aware of the order, and (3) that the party violated the order. *In re K.B.*, 2012-Ohio-5507, ¶ 11 (8th Dist.), citing *Arthur Young & Co. v. Kelly*, 68 Ohio App.3d 287, 295 (10th Dist. 1990); *Pendergraft v. Watts*, 2011-Ohio-5649.

{¶ 70} A party establishes a prima facie case for contempt where the order is before the court along with proof of the nonmoving party's failure to comply with it. *Bridgeland v. Bridgeland*, 2021-Ohio-2587, ¶ 18 (8th Dist.), citing *DeMarco v. DeMarco*, 2010-Ohio-445, ¶ 25 (10th Dist.), citing *Dzina v. Dzina*, 2004-Ohio-4497, ¶ 63 (8th Dist.). "Proof of a purposeful, willful or intentional violation of a court order is not a prerequisite to a finding of contempt." *Id.*, citing *Collins v. Collins*, 2018-Ohio-1512, ¶ 26 (8th Dist.), citing *Pugh v. Pugh*, 15 Ohio St.3d 136, 142 (1984). Once the prima facie case of contempt is established, the burden shifts to the contemnor to "either rebut the initial contempt showing or establish an affirmative defense by a preponderance of the evidence." *Combs v. Sherwin-Williams Co.*, 2026-Ohio-562, ¶ 19 (8th Dist.), citing *S.R. v. S.R.,* 2023-Ohio-531, ¶ 18 (8th Dist.).

{¶ 71} Courts have found that an affirmative defense may exist in a contempt proceeding when a residential parent interferes with parenting time when the parent establishes they had a reasonable, good-faith belief that they must deny visitation to protect the safety of the child. *Thompson v. Thompson*, 2023-Ohio-667, ¶ 57 (12th Dist.), citing *Brennan v. Brennan*, 2021-Ohio-1865, ¶ 37 (5th Dist.); *Steele v. Steele*, 2013-Ohio-3655, ¶ 20 (2d Dist.). The "'trial court does not abuse its discretion in

denying the good-faith defense when the trial court properly exercises its discretion to consider all surrounding circumstances and weigh all factors in deciding whether a parent is in contempt.'" *Id.,* quoting *In re J.H.P.*, 2015-Ohio-548, ¶ 19 (2d Dist.); *Hensley v. Hensley*, 2009-Ohio-1738, ¶ 26 (6th Dist.). In determining the reasonableness of the parent's good-faith belief, courts often look at the residential parent's attempts to access remedies. *Hensley* at ¶ 28. For example, in one case, the court found the parent's decision to immediately terminate visits based on accusations of sexual abuse unreasonable where they waited two months to file a motion in court to terminate visits. *Id.,* citing *Bardenhagen v. Bardenhagen*, 1990 Ohio App. LEXIS 3703 (12th Dist. Aug. 27, 1990). In another case, the court of appeals found that the trial court, who was the sole arbiter of the credibility of the witnesses, properly weighed testimony regarding the child's trauma by noting that the parent's expert witness only interviewed the custodial parent and the child, but did not interview the noncustodial parent and there was competent credible evidence to support the trial court's finding that the custodial parent did not have a good-faith basis for suspending visits. *Brennan* at ¶ 38 (5th Dist.).

{¶ 72} In the instant case, Mother testified that the shared-parenting agreement had been in place since 2016 and was modified in 2023 to allow Father to get the minor child directly from school rather than from Mother's home. On Friday, October 27, 2023, Mother got the minor child from Father to take him to a Halloween event. We can infer from the testimony that because it was Father's parenting time, the plan was to go to the event and return the minor child to Father's

care. When Mother got the minor child, she noticed that he smelled "horrendous." Mother testified that the minor child told her that Father did not have water or gas, so he could not bathe and it was cold in Father's home. Mother called Father to discuss the issues, but he refused to talk to her about the conditions of his house. Based on what she learned, Mother refused to return the minor child to his custody. Mother admitted into evidence text messages between herself and Father where she refused to return the minor child and informed Father to contact her attorney if he had any questions. Mother filed her motion to suspend parenting time approximately three weeks later at which time she also raised concerns about Father's alcohol and substance use.

{¶ 73} Father testified that Mother withheld parenting time until May 2024. Additionally, Father admitted that his gas was off, though he claimed the outage lasted for one week. Nevertheless, he did not provide any proof to Mother and he did not submit proof to the GAL regarding the utilities until May 2024. Further, Father did not submit a substance-abuse assessment to the GAL until May 2024, as well. Mother learned of the foreclosure and sale later. Father admitted his home had been sold. While Father claimed that there were further proceedings, he did not support his contentions beyond his testimony. There was no testimony regarding the present conditions of Father's home at trial, and Father never allowed the GAL to inspect his home to determine the conditions.

{¶ 74} The juvenile court did not address its findings on Mother's contempt during the trial or in its entry. The record establishes by a preponderance of the

evidence that Mother had a good-faith basis for suspending visits. She had multiple concerns and attempted to address them with Father, but he refused to address them with her. She immediately filed motions to allow the juvenile court to review her concerns. Throughout the proceedings, Mother noted that she wanted the minor child to have time with his Father and she only wanted confirmation that his living conditions were safe before returning the minor child to his care.

{¶ 75} Based on the foregoing, we find that Father established a prima facie case for contempt. However, Mother also met her burden, establishing by a preponderance of the evidence an affirmative defense to the charge of contempt. Therefore, the portion of the juvenile court's July 30, 2025 entry that found Mother in contempt of court is unenforceable. Accordingly, we sustain the sixth assignment of error.

{¶ 76} Judgment affirmed in part and reversed in part. Mother's first through fifth, and seventh assignments of error are overruled and her sixth assignment of error is sustained.

It is ordered that appellee and appellant split the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, PRESIDING JUDGE

ANITA LASTER MAYS, J., and
TIMOTHY W. CLARY, J., CONCUR